IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| MYRA PAUL COCHRAN, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| vs. | ) | CIVIL ACTION NO. 16-00193-CG-B |
|  | ) |  |
| ALABAMA POWER COMPANY[1], | ) |  |
|  | ) |  |
| Defendant. | ) |  |

## MEMORANDUM and ORDER

This matter is before the Court on a motion for summary judgment and brief in support filed by Defendant Alabama Power Company ("APCo"). (Doc. 32; Doc. 33). Plaintiff Myra Paul Cochran ("Cochran") filed a response in opposition (Doc. 42), to which APCo replied (Doc. 43). Based on the following, the Court **GRANTS** APCo's motion.

## I. NATURE OF THE CASE

This cause of action arises from a pay dispute between Cochran and APCo, her employer. In her First Amended Complaint, Cochran alleges APCo required her to complete work substantially similar to male comparators but for significantly less pay in violation of the Equal Pay Act of 1963 ("EPA"), 29 U.S.C. § 201, *et sequentes*.

---

[1] Alabama Power Company avers that Myra Cochran improperly named the defendant in this matter as "The Southern Company d/b/a Alabama Power." (Doc. 32, p. 1 n.1). Alabama Power Company contends that The Southern Company is a separate entity and, further, is not Cochran's employer. Despite this error, Alabama Power Company does not argue improper service or whether it is the proper employer. Further, Cochran does not dispute her error. Therefore, in as much as Cochran improperly named her employer, the Clerk is **ORDERED** to change the named defendant in this action to Alabama Power Company.

(Doc. 16, p. 2). Also, within the same count, Cochran contends APCo denied her the opportunity to earn additional income through out-of-town "storm work" but allowed her male comparators to "enjoy[ ] the lucrative assignments on a regular basis." *Id.* APCo now moves for summary judgment on all counts. Cochran responds that a genuine issue of material fact exists as to the substantial similarity between her work and her comparator's work. Cochran, however, concedes that her claim based on out-of-town storm work "is due to be dismissed." (Doc. 42, p. 4). Therefore, the Court **GRANTS** APCo's motion in as much as Count I alleges gender discrimination in assigning out-of-town storm work. The parties having fully briefed the remaining EPA issue, this matter is ripe for consideration.

## II. AGREED FACTS[2]

APCo has employed Cochran since 1985. Cochran served as an office clerk for the first several years of her employment. As an office clerk, Cochran processed paperwork for various APCo engineers. In 1999, Cochran secured a position as a Technician I in the Mobile Division of APCo's Power Delivery Distribution Department. APCo promoted Cochran to Senior Technician in 2000, which is the position Cochran has held since that time. Since 2003, Cochran has worked in the Mobile-Hillcrest APCo office, one of several branches within the Mobile Division. From 2003 until June 2016, James (Jim) Dunning ("Supervisor Dunning"), the Engineering Supervisor for the Mobile-Hillcrest office, was Cochran's immediate

---

[2] Cochran adopted APCo's factual statement for the purpose of deciding APCo's motion. (Doc. 42, p. 1). Thus, to the extent APCo's factual statement is relevant, the Court utilizes such as undisputed facts in deciding APCo's motion.

2

supervisor.  Additionally, Supervisor Dunning was the supervisor of Cochran's two male comparators: Joe Costa and Hank Anderson.

**A. Cochran's Duties as a Senior Technician**

Cochran describes her Senior Technician position as, "in layman's terms, I'm probably an engineering aide." (Doc. 34-4, p. 5).  Cochran's duties are geographically limited to the West Mobile section of the Wilmer community and part of the Town of Semmes.  Wilmer is predominately rural; Semmes is slightly more urban.  In servicing her territory, Cochran works to establish and maintain power delivery to new and existing APCo customers through electricity distribution systems, including the design, inventory, permitting, and cost estimates relating to said systems.  The majority of Cochran's work focuses on establishing power for customers, "usually a mom-and-pop or some young people," who are seeking to establish power to a mobile home or some other type of building.  (Doc. 34-4, p. 6).  Additionally, Cochran responds to customer complaints, inspects outages, and performs other maintenance-type work for customers in her territory.

Typically, Cochran submits a work estimate to her supervisor for approval once she has examined a customer's request for power, prepared an inventory, and diagrammed a plan.  Occasionally, Cochran's supervisor spots an error in her work, thereupon corrections are made or changes to the estimate are discussed with Cochran before approving the project.  Upon supervisor approval of the plan, APCo issues the plan to a crew foreman, who actually performs the work related to the power delivery project at issue.

**B. Background and the Duties of the Male Comparators**

Costa and Anderson, the male comparators mentioned above, are both Distribution Specialist I in the Mobile-Hillcrest office. Costa became a Senior Distribution Specialist at APCo in January 1994, then a Distribution Specialist I in October 2015. Before becoming a Distribution Specialist, Costa obtained field experience as a utility man, tree trimmer, and truck driver.

Anderson became a Senior Technician in April 2003, a Distribution Specialist in March 2005, and then a Senior Distribution Specialist in December 2008. Like Costa, Anderson became a Distribution Specialist I in October 2015.[3] Before becoming a Senior Technician and Distribution Specialist, Anderson obtained field and line crew experience working as a truck driver and lineman for nearly seven years.

Costa and Anderson are also responsible for engineering, designing, and maintaining electricity distribution systems across an assigned territory. But Costa and Anderson primarily work on jobs that are larger, more complicated, and often more commercial (*i.e.*, more complex distribution systems, more connections, more equipment, and greater budget). For example, Costa and Anderson work underground subdivisions. Cochran testified she has never done such work. (Doc. 34-4, p. 15). Additionally, Anderson has completed large-scale commercial power

---

[3] In October 2015, APCo amended the Distribution Specialist job family from two the three levels. As part of that process, Costa and Anderson were reclassified from Senior Distribution Specialist to Distribution Specialist I, a newly created position within the Distribution Specialist job family. This change was not considered a demotion.

4

setups, such as setting up power to a shopping center anchored by Gander Mountain outdoor stores.

In order to qualify to complete such complex tasks, each Distribution Specialist candidate is required to reach two mandatory milestones, which are outlined in APCo literature provided to Cochran. First, each Distribution Specialist candidate must successfully complete Electric System Operation Procedure ("ESOP") training[4] and pass a test signifying that the employee is qualified to perform switching work on the APCo electricity operating system (*i.e.*, these employees know how and when to turn power on and off to a certain portion of a distribution line in coordination with line crews working a particular project). Second, a Distribution Specialist I is required to be on the Official Clearance List. This list is essentially those employees who have passed the ESOP. Supervisor Dunning explained that achieving these milestones demonstrates a Distribution Specialist I's knowledge and experience of what decisions to make, and when to make them, on complex issues, which enables the Distribution Specialist I to understand and complete larger, more complex projects. Moreover, a Distribution Specialist candidate must demonstrate through day-to-day observation a sufficient understanding of the APCo distribution system.

Cochran acknowledged in testimony that in her job position, Senior Technician, she is not on the "switching list to give switching instructions to the line

---

[4] Each ESOP training session takes place at an off-site location and is conducted by an independent instructor. The session lasts four days and is fully paid by APCo. The expense associated with the training typically involves travel expenses and the loss of the employee for the time of attendance.

5

crew or whoever is opening and closing the switches out in the field, because there is a procedure for that. You have to pass the test and know all the ins and outs." (Doc. 34-4, p. 14). Cochran further explained switching is, indeed, a "life and death" matter. *Id.* at 15. Because mistakes can be deadly, APCo strictly scrutinizes the capabilities of those tasked with switching work.

Costa and Anderson have successfully completed ESOP training and are on the Clearance List. Both Costa and Anderson regularly perform switching work on APCo distribution lines in the performance of their jobs as Distribution Specialist I. Supervisor Dunning found both Costa and Anderson to be exemplary employees in completing this work.

**C. Pay for a Senior Technician and a Distribution Specialist I**

As a Senior Technician, Cochran is an hourly employee. The natural next step in the line of progression for Cochran is Distribution Specialist, followed by Senior Distribution Specialist.

A Distribution Specialist I, like Costa or Anderson, is a salaried employee. Distribution Specialist is a job family and each progressive level has the opportunity to earn more than the previous level. All Distribution Specialist levels (including Senior Distribution Specialist) have the opportunity to earn a higher rate of pay than a Senior Technician.

The total pay history for Cochran, Costa, and Anderson for three years preceding this lawsuit is illustrated in the following chart (designating in parenthesis each person's job position at the indicated time):

6

|               | Cochran                           | Costa                                           | Anderson                                        |
|---------------|-----------------------------------|-------------------------------------------------|-------------------------------------------------|
| March 1, 2013 | $ 52,842.61 (Senior Technician)   | $ 71,252.17 (Senior Distribution Specialist)    | $ 69,227.48 (Senior Distribution Specialist)    |
| March 1, 2014 | $ 53,371.03 (Same)                | $ 71,252.17 (Same)                              | $ 71,685.05 (Same)                              |
| March 1, 2015 | $ 54,785.37 (Same)                | $ 73,247.23 (Same)                              | $ 74,409.08 (Same)                              |
| March 1, 2016 | $ 56,089.26 (Same)                | $ 75,063.76 (Distribution Specialist I)         | $ 76,217.22 (Distribution Specialist I)         |

**D. Cochran's Documented Work Performance and Attempts at Becoming a Distribution Specialist**

Since 2000, Cochran has made four attempts at passing the ESOP but has been unsuccessful each time. APCo has not precluded Cochran from taking the test additional times; the only caveat is that no applicant is allowed to take the test more than once within a 90-day period. Though Cochran realizes that she possibly could be promoted to Distribution Specialist if she passed, she has not taken the ESOP test since 2012 because she has not had the time.

In addition to passing the ESOP test, a Distribution Specialist candidate must demonstrate through day-to-day observation a sufficient understanding of the APCo distribution system. Supervisor Dunning expressed doubts that Cochran had demonstrated the necessary job knowledge and technical expertise to become a Distribution Specialist. He explained that one of the necessary understandings of the APCo system for a Distribution Specialist is knowledge of three-phase bank installations; however, Supervisor Dunning explained that Cochran told him shortly before bringing this suit that she was uncomfortable working three-phase systems,

7

a skill he expected her to be proficient in at this stage in her career.

APCo conducts documented evaluations for each employee. The employee's supervisor completes each evaluation. Cochran's performance review for 2012 noted "Myra has shown little gain in knowledge[ ] of the distribution system. 40% to 50% of her jobs are returned due to inventory errors." (Doc. 34-3, p. 22). Her performance review for 2013 gave her an overall rating of "Needs Improvement" and observed that she "shows difficulties engineering and estimating W.E.'s [work estimates]." *Id.* at 23, 28. Cochran's performance review for 2014 concluded that Ms. Cochran's "Knowledge of Job" and "Quality of Work" both "Needs Improvement," that her "jobs require frequent revisions," and that Cochran "needs to request additional input and training from team members and foreman." *Id.* at 51. Supervisor Dunning explained that Cochran had the highest error rate of all of his subordinates during the years he supervised Cochran. He repeatedly observed problems with Cochran's infrequent work on small commercial projects, such as a drug store project, and even with her routine rural work, such as ordering the wrong size transformer for a single power pole.

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted: "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby,*

8

*Inc.*, 477 U.S. 242, 249 (1986). The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material preclude entry of summary judgment. *Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, at 249-250 (internal citations omitted).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Company*, 32 F.3d 520, 524 (11th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response .... must be by affidavits or as otherwise provided in this rule set out specific facts showing a genuine issue for trial." *Vega v. Invsco Group, Ltd.*, 432 F. App'x 867, 870 (11th Cir. 2011). In reviewing whether a non-moving party has met its burden, the Court must draw all justifiable inferences in favor of the non-moving party. *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998–99 (11th Cir. 1992) (citations omitted). Thus the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

*Liberty Lobby*, 477 U.S. at 251–52.

## III. ANALYSIS

### A. Prima Facie Case Under the Equal Pay Act

The EPA provides,

> No employer [subject to this section] shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees … at a rate less than the rate at which he pays wages to employees of opposite sex … for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex; *Provided*, that an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

29 U.S.C. § 206(d)(1). "To establish a prima facie case under the Equal Pay Act of 1963, a complainant must show that an employer pays different wages to employees of opposite sexes for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1532 (11th Cir. 1992) (internal marks and italics omitted).

To begin, a plaintiff must "compar[e] the jobs held by the female and male employees, and [show] that those jobs are substantially equal, not by comparing the skills and qualification of the individual employees holding those jobs." *Miranda*, 975 F.2d at 1533. "The standard for determining whether jobs are equal in terms of skill, effort, and responsibility is high." *Waters v. Turner, Wood & Smith Ins.*

*Agency, Inc.*, 874 F.2d 797, 799 (11th Cir. 1989). "When Congress enacted the Equal Pay Act, it substituted the word 'equal' for 'comparable' to show that the 'jobs involved must be virtually identical, that is, they would be very much alike or closely related to each other.' The restrictions in the Act were meant 'to apply only to jobs that are substantially identical or equal.'" *Id.* (quoting *Brennan v. City Stores, Inc.*, 479 F.2d 235, 238 (5th Cir. 1973) (footnote omitted)). Indeed, Congress did not intend the EPA to eliminate "employers' wide discretion in evaluating work for pay purposes." *Id.* As the Eleventh Circuit's predecessor articulated, the standard for equality is clearly higher than mere comparability yet lower than absolute identity …." *Brennan*, 479 F.2d at 238.

Further, "[t]he prima facie case also focuses solely on the primary duties of each job, not duties that are incidental or insubstantial. Any extra duties that might be used to distinguish two jobs may not be tasks that are typically performed by other personnel at lower pay." *Miranda*, 975 F.2d at 1533. And job titles, while entitled to some weight, are not controlling; rather, the Court must look to the "actual duties the respective employees are called upon to perform." *Id.*

Cochran contends she performed work substantially similar to Costa and Anderson during the relevant time frame. (Doc. 42, p. 2). Specifically, all three employees have been responsible for engineering, designing, and maintaining electricity distribution systems in his or her respective territory. *Id.* Any difference in the actual work performed by each of the three employees is admittedly due to the differences in their assigned territories. *Id.* Thus, the job titles are a distinction

11

without difference. APCo, however, insists that fundamental differences exist between a Senior Technician and a Distribution Specialist I. For instance, a Distribution Specialist I completes "larger, more complicated, and often more commercial work." (Doc. 33, p. 17). Additionally, a Distribution Specialist I performs unique tasks that can only be done after an APCo employee reaches two critical milestones. *Id.*

Evaluating the responsibilities of a Senior Technician, the majority of Cochran's work involves setting up power for residential customers. As Cochran described it, she usually sets up "a mom-and-pop or some young people" seeking to establish power to a mobile home or some building. (Doc. 34-4, p. 6). Her initial contact with such an employee does require engineering and submitting a work estimate for the project, but a foreman performs any work beyond this point. Additionally, Cochran responds to customer complaints, inspects outages, and performs other maintenance-type work for customers in her territory.

On the other hand, a Distribution Specialist I is expected to possess accumulated know-how and demonstrate technical expertise pertaining to complex issues that a Senior Technician does not deal with. For instance, large-scale commercial projects routinely fall on a Distribution Specialist I, and a Distribution Specialist I is expected to work on underground subdivision projects. This is something Cochran admits she has not done as a Senior Technician. Most importantly, a Distribution Specialist I is expected to complete the important task of switching work described above. An APCo employee is not even qualified to
12

provide switching orders until he or she passes the ESOP and is included on the Clearance List.

Comparing these two positions, the undisputed facts show that Cochran, although performing a somewhat simpler version of work, does not perform work substantially similar to her male comparators. The skill necessary to deal with the more complex jobs of a Distribution Specialist I and responsibility inherent in the additional qualifications is substantially different. Quiet simply, switching work is, in Cochran's own words, "life and death" work a Senior Technician does not perform. Therefore, Cochran's argument that any distinction in work is caused by the assigned territory is unpersuasive. Instead, it is the skill, effort, and responsibility of a Senior Technician that limits Cochran's work and, subsequently, her pay. *See Miranda*, 975 F.2d at 1533 (focusing on "the skills and qualifications actually needed to perform the jobs" in deciding whether a plaintiff established a prima facie EPA case). So, even if Cochran's, Costa's, and Anderson's work region were the same, there would not be a substantial similarity in their work given a Senior Technician cannot complete the work of a Distribution Specialist I.

Moreover, just because Cochran is able to point to some core functions that may overlap (engineering, designing, and maintaining electricity distribution systems), she does not necessarily establish a prima facie EPA case. Several courts have rejected arguments analogous to Cochran's "similar core functions can establish a prima facie EPA case" argument upon which she hangs her hat. *See, e.g., Rollins v. Alabama Cmty. Coll. Sys.*, 814 F. Supp. 2d 1250, 1315 (M.D. Ala.

13

2011) (holding the plaintiff did not establish a prima facie EPA case based on general similarities in positions); *Byrd v. Auburn Univ. at Montgomery*, No. 2:05-cv-835-CSC, 2007 WL 1140424, at *9 (M.D. Ala. Apr. 17, 2007) (concluding a prima facie case must focus on the primary duties of each job and not the similarities in "core tasks" inherent in each job). The Court finds *Rollins* and *Byrd* persuasive and, like those decisions, declines to adopt Cochran's "similar core functions" argument. In short, Cochran failed to establish a prima facie EPA case because her male comparators, as Distribution Specialist I, are responsible for complex and critical electricity distribution system functions that are not part of a Senior Technician's job.

**B. Equal Pay Act Exceptions**

But even if Cochran could establish a prima facie case, she would not survive summary judgment because APCo established that at least one of the EPA's four exceptions apply. Once a plaintiff establishes her prima facie case, "the burden shifts to the employer to prove the difference in pay is justified by one of the four exceptions" stated in the Act. *Miranda*, 975 F.2d at 1532. In this sense, the EPA "prescribes a form of strict liability: Once the disparity in pay between substantially similar jobs is demonstrated, the burden shifts to the defendant to prove that a 'factor other than sex' is responsible for the differential. If the defendant fails, the plaintiff wins. The plaintiff is not required to prove discriminatory intent on the part of the defendant." *Id.* at 1533.

APCo contends non-sex reasons justify Costa's and Anderson's greater rate of

pay. To begin, Cochran is not a Distribution Specialist I but Costa and Anderson are. (Doc. 33, p. 21). The "increasing steps in job positions are a legitimate business reason for the challenged pay disparity, and has nothing to do with sex." *Id.* Additionally, Costa and Anderson have field experience that increases their value to APCo. *Id.* at 22. Conversely, Cochran's office experience is not as relevant as her male comparator's field experience; she has not accomplished the training milestones of her comparators; and has a documented history of poor performance. *Id.*

Cochran does not attack these allegations. She simply circles back around to her earlier argument and doubles down on each employee engineering, designing, and maintaining electricity distribution systems for his or her respective area and that this work is substantially similar. *Id.* At best, Cochran continues, *Hall v. Siemens VDO Auto*, 481 F. App'x 499 (11th Cir. 2012), establishes that any difference in job responsibility and training is a question of fact for a jury. *Id.* The Court finds Cochran's position unavailing.

To be sure, an employer does not necessarily run afoul of the EPA by implementing a job classification system that pays distinct positions differently, as long as the distinction in positions is not based on sex. Such an understanding has been in place since the EPA was initially enacted. *See* Cong. Rec., Vol. 109, Part 7, Page 9209 (88th Congress, 1st Session) ("Seventh. Differences in pay that are based upon a bona fide job classification system will not violate this act, if not based on sex.") Therefore, APCo's greater remuneration of a Distribution Specialist I because

15

it is part of a graduating job classification scheme is a reason other than sex for a pay differential. And citation to *Hall* does not repair Cochran's claim because *Hall* is materially distinguishable. In *Hall*, the plaintiff and comparators held the same position. 481 F. App'x at 500. It is undisputed that Cochran and her male comparators do not hold the same position with APCo.

Next, APCo has established that the comparators possess valuable prior field experience. Costa worked in the field as a utility man, tree trimmer, and truck driver; Anderson had nearly seven years in the field as a truck driver and lineman. Cochran concedes this experience is valuable. (Doc. 34-4, p. 17). The prior work experience of a comparator is a reason other than sex for a pay differential. *Miranda*, 975 F.2d at 1533 n.18; *see also Cazeau v. Wells Fargo Bank, N.A.*, 614 F. App'x 972, 981 (11th Cir. 2015) (affirming a district court's grant of summary judgment on an EPA claim where an employer relied on a comparator's greater experience as a non-sex factor for a pay differential).

Lastly, undisputed evidence shows Cochran has a significantly higher error rate in her work than any other employee under Supervisor Dunning's direction. Supervisor Dunning also expressed how Cochran is uncomfortable operating three-phase systems, a system he said Cochran should be proficient in at this point in her career, and how Cochran has not demonstrated the know-how necessary for more complex and perilous jobs. But Supervisor Dunning did not express the same reservations about Costa and Anderson; instead, he characterized each comparator's performance as exemplary. This difference in work performance is a

factor other than sex reconciling the pay differential. *See Schwartz v. Florida Bd. of Regents*, 954 F.2d 620, 623 (11th Cir. 1991) (affirming a district court's determination that employee performance is one of multiple factors other than sex satisfying a defendant employer's burden under the EPA); *Seldon v. Total Sys. Servs., Inc.*, 653 F. Supp. 2d 1349, 1363–64 (M.D. Ga. 2009) (including a plaintiff's poor work performance and demonstrated lack of know-how as relevant factors other than sex in finding "gender played no part" in a wage differential). Thus, even if Cochran was able to establish a prima facie EPA claim, APCo has established that the pay differential between Cochran and her male comparators, Costa and Anderson, is driven by a factor other than sex.

## IV. CONCLUSION

Based on the foregoing, the Court **GRANTS** APCo's Motion for Summary Judgment (Doc. 32). A Judgment dismissing all claims with prejudice will be entered separately.

**DONE** and **ORDERED** this 19th day of May, 2017.

/s/ Callie V. S. Granade
SENIOR UNITED STATES DISTRICT JUDGE